Edward Stabile
16 Rutgers Street
Belleville NJ 07109

May 2, 2019

United States Bankruptcy Court
District of New Jersey
50 Walnut Street
MLK Federal Building
Newark NJ 07103

Attn: Judge Gambardella

I am writing to ask the court if you would review and provide clarification regarding a potential deal to pay my bankruptcy debt which my court appointed bankruptcy trustee, Steven Kartzman, is negotiating with my sister - Sharon Adelman.

I became aware of this in early April and afterwards had several phone conversations with Mr. Kartzman who confirmed the deal and provided me with some details over the phone. To date I have not seen a draft of the agreement — but my understanding from our conversations is that Mr. Kartzman has accepted an offer of $59,000 from my sister to repay my $70,000 bankruptcy debt. In exchange for her initial payment of $59,000, my sister will receive upon court approval approximately $200,000- $250,000 worth of my stock in Cheyenne Corporation, one of the 3 Stabile Family Corporations we presently own. Cheyenne Corp.'s only asset is the property which the western theme park, Wild West City, is located on in Byram Township NJ.

In addition, Sharon will receive 7% interest on her $59,000 until a piece of property adjacent to Wild West City, but owned by another family corporation, - Western World Inc., can be sold. This property has been designated by the State of NJ to be developed as the future town center of Byram Township. Should the interest my sister will be charging me, exceed the value of my shares in Cheyenne Corp, the amount still owed to my sister will then be deducted from my stock in Western World Inc. and/or Pink Elephant Corporation - which owns a liquor license used by Wild West City. Any fees incurred by Sharon from any future litigation to do with the family businesses will also be paid by me and deducted from my interests in Western World Inc. and/or Pink Elephant Corporation. Sharon also intends to take control of both my shareholder and Board of Directors interests in all 3 corporations through this arrangement.

Prior to my bankruptcy filing, Sharon and I, along with my brother Michael and sisters Mary and Carol, were involved in a lengthy oppressed shareholder lawsuit brought against us in March 2003 by my younger brother, James Stabile (the oppressed shareholder in the suit) over his operation and mishandling of another family owned corporation - Brookside Farm & Gravel which has since been dissolved. BFG as it was called leased a gravel pit in Stillwater NJ from my mother. Using BFG, James sold gravel from this pit for years without my knowledge, removing in excess of a million dollars worth of gravel without any distribution of monies to shareholders - including my mother.

In 2009, James' litigation resulted in a settlement agreement being reached by all of us in mid-trial. The attached copy was read into the record, signed by all parties involved and approved by the late Honorable Judge Gannon. By this time, I had paid well over $100,000 in legal fees and owed another $110,000 to my lawyers — which was the major cause of my bankruptcy. As I had not been involved with the family businesses since 1972, I had little knowledge of what transpired in the years prior to the BFG lawsuit and was misled by Michael, Sharon and Mary as to the amount of legitimate debt owed by the various Stabile Family Corporations. Had

I known the debt was no longer legal I would have reconsidered filing for bankruptcy. However it wasn't until after declaring bankruptcy when Mr. Kartzman became involved that I discovered most of the debt owed was no longer bonafide.

That said, my biggest concern about the deal presently being negotiated, is my sister's assumption of my interests in Western World Inc and Pink Elephant Corporation. Due to the acrimonious nature of my brother James' BFG law suit and a longstanding bitter feud between he and my sisters - Sharon and Mary, the settlement agreement was written with a clear intent to prevent another family lawsuit from occurring by protecting each of our shareholder/director's rights and interests within the Stabile Family Corporations from any future abridgment by any other shareholder/directors.

Section 16 of the agreement states: "No director of Western World or Pink Elephant shall be removed unless such director has violated one or more New Jersey corporate statute(s) in connection with his or her services as director of said corporation". Obviously not all potential pitfalls could be anticipated or addressed in detail with such a hastily crafted document, but I believe the intent to protect each of our interests from other shareholder's predatory behavior is clear throughout.

On Thanksgiving Day, 2018, my eldest brother, Michael, passed away after a lengthy illness. His estate has passed down to his three surviving children - Michael, Joseph and Robert. During the BFG litigation, my brother Michael had purchased the Wild West City operating business, Cayuse LLC, from Western World Inc. Unlike my brother, my nephews have no interest in running a failing business and are in the process of settling my brother's estate and declaring Cayuse bankrupt. They, along with my sister Carol, have expressed interest in trading their collective shares in Cheyenne Corporation with Sharon and my sister Mary, for an equal value of their shares in Western World Inc. This would allow my two sisters to own the Wild West City property and form their own LLC to operate the theme park this year without a cash exchange.

My sister Sharon is steadfastly refusing to agree to any trade. It appears that she and my sister Mary, who are now minority shareholders in all three Stabile Family Corporations, intend to use the bankruptcy court to gain control of them through this deal - just as James similarly tried to do with the Family Corporations prior to my mother's death in 2002. This attempt by James failed but led to his oppressed shareholder lawsuit against the rest of us. It would be bitterly ironic if the court allows this to happen again. I was collateral damage in their first feud - which cost me my retirement savings, a 27 year relationship and a career in Los Angeles. I would prefer not to have this occur again as I am presently in poor health and have been told by doctors to relocate to Arizona as soon as possible.

I was informed by Mr. Kartzman when he became my trustee, that the court had a fiduciary responsibility to both my creditors and to me. From my vantage point Sharon's offer fails on both counts. It is $11,000 short of settling my actual debt to my creditors. And if Sharon's deal is formalized, I believe she may be in violation of the terms she agreed to in the Brookside Farm & Gravel settlement agreement.

My hope is that the Court will consider other alternatives. Sharon's agreement could be limited strictly to Cheyenne Corporation, which is not specifically banned in Section 16 of the agreement. She could receive all of my interest in Cheyenne Corporation, approximately $250,000 worth of stock, in exchange for her investment of $59,000 - a return of nearly 400% — but nothing more than that. Or the Court could simply order a sale of Cheyenne Corporation, at which point my two sisters could buy out the 5 majority shareholders.

If Sharon and Mary are unable or unwilling to do that, there is presently an interested buyer, whose family submitted a bid to purchase our various properties approximately 18 years ago. Mr. Davino has tentatively suggested a price of $10.5M for both Cheyenne and Western World Inc.'s properties. Unfortunately Sharon and Mary are opposed to dealing with him and recently filed papers with the court in what appears to be an effort to delay or derail the deal. Also, at various times the State of NJ, Byram Township and several conservation groups have each expressed interest in purchasing the Cheyenne Corporation's property. And should all else fail, the property could simply be auctioned off and my debt discharged. None of these solutions would violate the terms of our court approved BFG Settlement Agreement.

During my recent conversations with Mr. Kartzman we discussed his fiduciary responsibilities - both to my creditors and to myself. After expressing my opinion that the deal with my sister fulfilled neither of these, I asked why he hadn't petitioned the court to order a sale of Cheyenne Corp as he told me he could do several years ago . After a pause, he said - "They didn't want to sell it". Obviously he wasn't talking about me, my nephews or my sister Carol, who may be trapped forever in these corporations by two very angry relatives, if Sharon's deal is approved.

Thank you for all your time and patience in this matter.

Sincerely,

Ed Stabile


cc: Steven Kartzman

## TERMS OF SETTLEMENT

The following provisions reflect all material terms of the Settlement Agreement between the parties appearing at the trial of the matter James Stabile, et al. v. Mary Benson, et al., Docket No. SSX-L-484-05. The parties appearing are siblings James Stabile, Michael Stabile, Mary Benson, and Edward Stabile. The other two siblings, Carol Stabile and Sharon Adelman, were not present at trial. Carol Stabile previously appeared through counsel, and thereafter advised the Court of her intention not to appear and not to participate at the trial or settlement discussions in this matter. Similarly, Sharon Adelman has previously resolved any claims of James Stabile pursuant to a Settlement Agreement dated October 30, 2008, pursuant to which, she agreed that she would not object to any Order, Judgment or Decision of the Court entered in her absence and pursuant to which she agreed to be bound by any relief ordered against any or all of the Stabile Corporations, among other things.

The parties hereto acknowledge that this litigation has been vigorously litigated for several years, including several weeks of trial testimony, including the presentation of evidence on behalf of James Stabile. The Hon. Edward V. Gannon J.S.C. has observed that based upon the evidence presented to date, that it is in the best interest of the parties that James Stabile be bought out, all without the Court having to reach the issue of whether or not there was any wrongdoing by any party; and Judge Gannon agrees that the transfer of Lot 16 to James Stabile to satisfy a Judgment compelling the sale of James Stabile's interest in Cheyenne Corporation is fair and equitable under all of the circumstances of this litigation; and Judge Gannon further agrees that resolution of this litigation pursuant to the terms of this settlement is fair and equitable under all of the circumstances of this litigation.

The parties appearing at trial agree to vote as directors and/or shareholders, as the case may be, in favor of this Settlement Agreement and to take all actions reasonably necessary to effectuate the terms of the Agreement. The parties recognize that it is impossible to anticipate all the issues that may arise, and that it may be necessary to invoke the assistance of third-parties, including the Court, to interpret this agreement and/or supply missing terms. The parties also agree that this Settlement Agreement, when finalized in a written document, will be submitted as a Consent Judgment to the Court for approval.

1. James Stabile, Michael Stabile, Mary Benson and Edward Stabile will agree to a dismissal of the pending action, with prejudice and without costs, legal or other fees, or expenses assessed against any party subject to the right of any party to bring an action to enforce the terms of this Settlement Agreement. Upon a vote of a majority of the Directors of Cheyenne, Western World and Pink Elephant approving this Settlement, all claims by and against said Corporations shall also be dismissed with prejudice and without costs, legal or other fees, or expenses assessed against any party subject to the right of any party to bring an action to enforce the terms of this Settlement Agreement

2. Judgment shall be entered whereby Cheyenne shall acquire from James Stabile his stock in Cheyenne, and said judgment shall be promptly satisfied by the transfer of Block 34, Lot 16 and Block 33, Lots 3, 4, 5 and 6 in Byram Township (all such property, together, "Lot 16") to James Stabile pursuant to the terms of this Agreement.

3. In the event a Court of competent jurisdiction determines that the conveyance identified in the preceding paragraph is void or voidable as a result of a claim

asserted by or on behalf of Scott Harris arising out of the lawsuit filed on behalf of Scott Harris against Cheyenne Corp., et al., Docket No. SSX-L-335-08 (the "Harris Litigation"), then in that event all parties will return to the status quo prior to today (i.e., this litigation may be reinstated by motion of any party hereto). All parties to this Agreement, including the Stabile Corporations, agree to oppose at their own expense any effort or action by or on behalf of any party or individual to challenge or void the conveyance identified in the preceding paragraph or this Settlement Agreement.

4. Cheyenne will continue to defend all claims asserted by Scott Harris against the corporation. All shareholders/directors of Cheyenne, Western World and Pink Elephant shall be defended and indemnified in connection with the Harris civil matter by the respective Stabile Corporation to the extent that any claims against these individuals are not covered by insurance to the extent allowed by law.

5. Western World agrees that the only lien on Lot 16 is that of Davis Chant and that Western World shall assume all liabilities for the judgment lien of Davis Chant, and shall defend James Stabile in connection therewith. It is understood that the cooperation of Davis Chant is necessary to effectuate this provision. Defendants shall, within 20 days of today, contact Davis Chant and obtain a release of the lien on Lot 16. If the lien is not fully released within said 20 days, James Stabile shall have an additional 20 days to either satisfy that lien, in which case he shall have a corresponding lien on Lot 5, or James Stabile shall terminate this Agreement and this litigation may be reinstated by motion of any party. In the event James Stabile obtains a lien on Lot 5, he shall not foreclose on such lien. Notwithstanding the

foregoing, it is expressly agreed that all liabilities and expenses associated with the contemplated DOT acquisition of a portion of Lot 16 shall remain the liability of Lot 16 and James Stabile will defend and indemnify Cheyenne from and against any liabilities associated with such claims. Defendants will identify such liabilities before this Agreement is memorialized into a Judgment. It is also recognized that there are additional liabilities related to Lot 16 which may be James Stabile's responsibility. In the event of disagreement, the dispute will be resolved by the Court.

6. All parties shall disclose all conditions, liabilities and status of DOT negotiations with respect to Lot 16 known to them and will provide to James Stabile a copy of the most current survey and any reports relating to the condition of the property, and Cheyenne hereby instructs its counsel at the Mandelbaum Salsburg firm to promptly disclose to James Stabile all information, conditions, liabilities and documentation concerning the status of DOT negotiations with respect to Lot 16. Michael Stabile and Mary Benson represent to the best of their knowledge that they are unaware of any conditions on or concerning Lot 16 that have not previously been disclosed to James Stabile or have not been set forth in any documents that have previously been produced to James Stabile and that there are no known adverse conditions concerning Lot 16, including any debt (except as disclosed in this Agreement), and that there are no pending contracts, no agreements granting any rights or interest in Lot 16, and no negotiations concerning Lot 16 except for the DOT negotiations. In the event James Stabile learns through this process, and prior to finalizing this Settlement in a writing

signed by all parties after Corporate approval, of any material adverse conditions concerning Lot 16 which were not otherwise known by James Stabile prior to this date, James Stabile may terminate this Agreement and upon motion of any party hereto, this litigation shall be reinstated. The previously pending quiet title action has been resolved in favor of Lot 16. James Stabile hereby confirms that he is aware that Lot 16 is assessed as farmland and that if he wishes it to remain so, it is his responsibility to comply with all governmental requirements. James Stabile also confirms that he is aware that Lot 16 is within the New Jersey Highlands.

7. Upon the consummation of this Settlement and the transfer of his shares in Cheyenne, James Stabile shall cease to be an officer, director and shareholder of Cheyenne and will execute any documents reasonably necessary to effectuate this provision.

8. Western World shall continue to actively market the property known as Lot 5 through the services of Paul Werkmeister. Mr. Werkmeister shall promptly select a successor who will continue to market Lot 5 in the event Mr. Werkmeister becomes unwilling or unable to do so. In the event Mr. Werkmeister's designee is unable or unwilling to market Lot 5 at any time, the new successor shall be chosen through a unanimous vote of the shareholders of Western World or if no unanimity is obtained within 30 days, said designee shall be selected by the Designated Representative. The Board of Western World may replace Mr. Werkmeister or his successor by unanimous vote.

9. The Designated Representative shall be selected by a unanimous vote of the Board of Western World. If the Board of Western World cannot reach a unanimous

decision of the designation of the Designated Representative within 45 days of today, then each shareholder of Western World shall submit 2 names to corporate counsel, who shall eliminate any duplicates and submit the list to Judge Gannon who will appoint the Designated Representative from the names submitted. The Designated Representative shall be an individual who, in addition to resolving any disputes under the preceding paragraph, shall have full authority to bind Western World and its shareholders to a contract of sale for Lot 5, subject to the terms set forth below and to be more fully incorporated into a Limited Power of Attorney. The Designated Representative shall be an attorney who is knowledgeable about Sussex County real estate.

10. Western World shall not enter into any contract of sale for Lot 5 absent the unanimous consent of all shareholders where the purchase price is less than Seven Million Dollars and where the contract does not result in the payment of at least Six Million Dollars to Western World in cash at closing, with any additional balance payable upon the satisfaction of contingencies such as density or development.

11. Upon being presented with a contract of sale for the purchase of Lot 5, the Board shall have 120 days from the date of receipt of the Contract by the potential buyer or on behalf of Western World to enter into a binding Contract with the buyer. If the Board fails to enter into a binding Contract or disapprove the Contract for the subject transaction within 120 days from receipt, then the Designated Representative shall in his or her sole discretion determine if he shall grant the Board an extension of an additional 60 days to approve or disapprove the

contract. In the event that the Board fails to approve or disapprove the contract within this timeframe, then the Limited Power of Attorney shall be released from escrow and the Designated Representative shall undertake the completion of the negotiations and, if applicable, the sale of Lot 5 if in the Designated Representative's best judgment the transaction is in the best interests of Western World, subject only to those limitations as set forth in the Limited Power of Attorney. No shareholders shall have communications with the Designated Representative except upon reasonable prior notice to all shareholders, or if said notice is not practical given the circumstances, there shall be prompt full disclosure of the communications to all shareholders. Before signing any binding contract, the Designated Representative shall provide it to the Board, which shall have 20 days to advise the Designated Representative of a unanimous vote rejecting the contract, in which case, the contract shall be rejected. The Designated Representative shall also provide the Board with updates of the status of the contract and give a minimum of 20 days notice before signing the contract. The unanimous vote of the shareholders of Western World shall supersede any decision of the Designated Representative. The Designated Representative shall be paid at closing for the sale of Lot 5. In the event the Designated Representative refuses to wait until the closing of Lot 5 to be paid, or if the Designated Representative rejects the contract so there is no closing for that transaction, the fees of the Designated Representative shall be borne by Western World.

12. Western World shall not incur any debt on behalf of, or voluntarily encumber, Lot 5 or Western World except as is necessary for the preservation, marketing, sale,

and third-party development of Lot 5. Any expense permitted under this section shall require an advance majority vote of the Board of Western World unless said expense is less than $1,000 in any given month. Any expense paid or liability incurred as permitted under this section without majority vote of the Board of Western World shall be disclosed to the Board as soon as practically possible with all supporting documentation.

13. James Stabile shall agree to the conversion of Western World from a C corporation to an S corporation and all parties shall cooperate to minimize any tax consequences as a result of the transactions contemplated herein. Western World shall indemnify and defend James Stabile from and against all liability and attorneys' fees associated with any claims or liability against James Stabile due to Western World being an S corporation to the extent said liability would not exist if Western World remained a C corporation.

14. It is understood that this Agreement is not intended to modify in any manner James Stabile's interests in either Western World or Pink Elephant and that he remains a 1/6 owner of each of those entities who is entitled to receive 1/6 of the net proceeds from those entities. The parties agree that they will not modify Michael Stabile's agreement to purchase Cayuse or the sale of Pink Elephant to Michael Stabile and/or Cayuse in a manner that will reduce or delay the amount that James Stabile will receive from those transactions. The Pink Elephant transaction has been approved by the Board as confirmed in Barry Mandelbaum's June 1, 2009 letter to Mary Benson and Michael Stabile enclosing the May 26, 2009 Annual Meeting minutes of Western World and Pink Elephant, but has not

been memorialized in a writing. The parties agree that the terms of the Pink Elephant transaction already approved by the Board shall not change unless all shareholders agree to convert the transaction into a stock sale.

15. The parties recognize that this settlement was reached during the course of a lengthy trial in this matter and is being entered into in order to avoid the expenses of further litigation and to minimize any risks and therefore the settlement of this matter shall not be deemed an admission of any wrongdoing by any party. It is expressly agreed that no party shall be deemed to be a "prevailing party" for fee shifting purposes.

16. No director of Western World or Pink Elephant shall be removed unless such director has violated one or more New Jersey corporate statute(s) in connection with his or her services as director of said corporation.

17. Upon the sale of Lot 5 as contemplated herein and full distribution of proceeds, Western World shall be dissolved or Western World shall purchase James Stabile's interest in Western World for $1.00, and if James Stabile's interest in Western World is purchased pursuant to this paragraph, James Stabile shall also resign from the Board of said corporation.

18. Western World Board meetings shall be separate from Cheyenne Board meetings, and all Western World meetings shall be noticed as either shareholder meetings or directors meetings. All such Western World meetings shall require at least 1 week prior written notice, with said notice setting forth the full agenda for the meeting. All Board members shall provide their monthly schedules to the Board upon receipt of same. The Board shall make all reasonable efforts to schedule Board meetings during

times when all members are available. If a meeting is scheduled at a time when a Board member is unavailable, the Board will make its best efforts to reschedule the meeting. In the event a Board meeting nonetheless proceeds in the absence of a director, that director may, prior to the Board meeting, submit his or her vote on any or all agenda items in advance by e-mailing same to Mary Benson and Barry Mandelbaum or his designee.

19. The interest of James Stabile in Western World shall not be reduced more than $10,000 by any liability or responsibility for any legal fees, expenses, penalties or fines in connection with the Harris criminal matter from this date forward. The foregoing does not include any indemnification required to be paid by Western World.

20. All provisions herein shall apply equally to all successors, assigns and beneficiaries.

21. Barry Mandelbaum shall attempt to compromise all debts of Western World and Cheyenne and present the proposal to the shareholders sufficiently in advance of the closing for the sale of Lot 5 to permit any party who disagrees to present to the Court any challenge to the assignment of the debt. The Court shall retain jurisdiction to resolve any issue in connection with this paragraph.

22. The parties agree to take no action to injure or harm each other or frustrate the purpose of this Agreement. The parties recognize that there may be a potential conflict with the marketing of Lot 5 and Lot 16, and nothing herein shall preclude James Stabile from marketing Lot 16 as he deemed appropriate. No party hereto shall voluntarily disclose to any non-party (excluding family members, or attorneys,

accountants or other professionals employed by a party) any information concerning this litigation.

23. Michael Stabile will remove the Wild West City sign on Lot 16 upon the closing on the sale of Lot 5 or at least 30 days prior to the closing for sale of Lot 16, upon prior written notice. Michael Stabile shall be responsible for maintaining the sign in good condition and is responsible for any and all costs associated with the sign. Notwithstanding the foregoing, upon 60 days prior notice, James Stabile may remove (if Michael Stabile does not do so) the Wild West City sign in connection with any sale of Lot 16 or any development of Lot 16 when necessary governmental approvals and permits are obtained, or as required by law. This provision of the agreement shall be deemed an agreement to license the sign to Michael Stabile or his designee for $100 per year.